The Honorable Justice of the United States Court of Appeals in and for the Seventh Judicial Circuit. I think in this situation where it's very clear that Mr. Ball does not have the knowledge necessary in order to navigate the system. Let me interrupt you. I was struck when you said he didn't know that he needed to file affidavits at the summary judgment stage. We require district courts to notify pro se litigants of procedures like that. Are you saying that the district court did not give that required notice? I don't know in the record where exactly that would be. I'm not certain about that. If that notice wasn't given, we're looking at something that's reversible automatically. If that notice was given, then your statement is false. We need to figure out which of these is true. I don't see how my statement is false. The statement that he didn't know he needed to file affidavits will be false if he was told by the district judge that that's what he needed to do. We need to know whether the district judge gave that notice. It's required. I don't know, standing here right now, whether or not the district judge gave that notice. It's typically something that would have been filed by the court after the defendants filed their motion for summary judgment. I can look in the record and on rebuttal I'll come back and let you know what I can find. I have the record here. I think the point about the affidavits goes more to prejudice and the appointment of counsel than I think to anything else. It just shows his inability or his lack of understanding of the system that prejudiced him without an attorney in this instance. But isn't that almost always the case? I mean, with a pro se who has no knowledge of law, how would he be different from the thousands of cases? I think the way the main way that he's different is the main way that he's different is that he showed his incapacity actually in his in his motions. So if you look at his motions for appointed counsel, he struggled to articulate his claims. Now, on the first two, he had help from a jailhouse lawyer, a paralegal who was there. They're typed up. His third one, his motion to reconsider, at B-28, he references the constitutionality of a federal statute being at issue, the federal disability statute being at issue. At B-29, he references medical and mental health care cases which were dismissed. It's very clear in his submissions to the court that he did not understand the what was going on in his case. And I think that's what makes this this this core issue different. I think that the abuse of discretion of the judge below is not necessarily that there's no basis to deny counsel to Mr. Ball. It's that he arbitrarily made that decision. This court requires that the. But how can you say that he arbitrarily made the decision? And it seems to me that you are confusing or merging together the true two prongs of the Pruitt test. The district court never got to prejudice. Because the district court's focus was on the first prong, whether or not your client had made a good faith effort to recruit counsel. And the district court was very clear that if he sought a motion to reconsider, that he should include a copy of the letter that he sent out to counsel, so that the district court could make an assessment based on the content of that letter if he had really made a good faith effort. I mean, it's one thing to say, I'm in prison. I need your help. It'd be another thing to give some detail about what he was pursuing and why. And that's what the district court wanted to look at. So how was that an abuse of discretion for the court to, in all three instances where he filed motions for counsel, deny it primarily on that first prong, not the prejudice prong? Right. So the prejudice piece is something that this court looks at. But the reasonable measures to obtain counsel is, I agree, where the court's role is focused. if the district court did not abuse its discretion on the first prong. True. So let me get to that. The district court below treated that reasonable measures as a gating issue. And this court in Pruitt does call it a threshold issue, but it has to address it in order to rule. What's the difference between gating and threshold? You know, we say the same in Daubert that we're gatekeepers to determine whether or not expert testimony could come in. It's a threshold question. I do think it's not threshold. It doesn't relieve the court of the obligation to weigh the plaintiff's competence against the plaintiff's difficulty. Yes, it does. If it's a threshold issue, you don't get over the threshold. Nothing else matters. Now, we did this on Bonk. I don't think you want to spend your time here. Yeah, I'll move on. I would like to go back to something that was in your very first sentence, which is he was told to heat the water to boiling and carry it. What does the record show about that statement? What does the record show that he was told that the water must be boiling? So he testified in his deposition and in his declaration that he was instructed to – By whom? Well, so he was instructed to carry the water. He testifies that the supervisors were the ones who kept the water hot. And so I think there's a fair inference there that he was not – Is there any evidence in the record that he or the other inmates were told to heat the water to boiling as opposed to 110 degrees, which is what the defendants said? I think it's a fair inference from his testimony and his deposition and from the declaration where it's the supervisors who are the ones who are in control of the hot water. There's no record evidence to suggest – That's a problem, though. If by hot the supervisors mean 110 degrees, reasonably hot, it also is not going to be a serious problem if the pail is dropped. If by hot they mean 212 degrees, it is going to be a very serious problem. It doesn't seem to me that it's a fair inference on being told you need hot water that that means boiling water. So I'm really looking for evidence in this record. That seems to me an absolutely critical question. So I think there's two responses that I'd like to give to that one. The first one is that I think it is a fair – there's no evidence that the inmates were the ones that were actually in control of this. The inference that I think is fair, and this is on summary judgment, you need to draw the inferences in our favor, are that the supervisors were the ones who controlled the water. Now, it might be the case that Danny Hobart can go to a jury and say, well, it was just freakishly hot on that day, that that was just a freak element. But the consistency of the hot water is at issue here. Ball testifies that – Do you agree that in order to satisfy the objectively substantial risk of serious harm, that the water has to be either boiling or at a temperature that could cause the third degree burns? So if it's just 110 degrees or 90 degrees or something less than boiling, that we don't have the risk of serious harm. I think it's a much tougher case if you don't have – if we don't have the boiling water, but this court doesn't have to go there because the water was boiling. I mean, the water was so hot. I want to go there because I share some of what I think are Judge Easterbrook's concerns about the lack of evidence regarding the temperature. And it seems to me that in order to take this out of the regular slip and fall case that we have said doesn't qualify, that the temperature of the water and the fact that the water needed to be boiling is what makes this case a potential risk of serious harm. I do think it's the combination. In this case, it is the combination of how bad that floor was and how hot that water was. So what's your best evidence that the water that the inmates were carrying was over 110 degrees? A glancing blow with his water on his shirt melted his shirt to his arm. It was so hot that simply spilling it on himself caused third degree burns and peeled off his skin. It was very hot water. That wasn't my question. I'm assuming that the water was boiling. The problem is that the two defendants – we'll put Hobart to one side for a moment. The two defendants, supervisors, aren't in the kitchen at the time. How in the world does the record show that they told the inmates that the water should be boiling or that they knew that the inmates boiled the water instead of heating it to 110? So I don't think we have to go to Hobart. We can come back to Hobart later on that. Suzy Hobart, you mean? Because there's two Hobarts here. There's Danny Hobart. Sorry. There's a lot of names. Daniel Hobart. Isn't it Daniel Hobart? Daniel Hobart, yes. That's right. In terms of Daniel Hobart. So the record evidence here shows – Ball talks – he was there for a week. He could see the conditions before he was even there when he worked in the dining room. And I think it's a fair inference from the fact that he was there for a week and it was a consistent situation and the fact that he could see it from before that it was longstanding. But how could he see the water was boiling? That's the question. Not the floor. Right. He does testify to steam coming off of it, to the heat of it. He testifies to – I think – Steam comes off of water at 110. Steam comes off a cup of coffee at 110. Even less. Right. So the nature of the heat of the water, whether it was hot on that day or whether it was consistently that hot all the time or this was a freakish accident, we're in inference land there. And we're the non-moving on summary judgment. We should get the benefit of the inference that that was consistent. But you still have to have sufficient evidence to draw an inference that Daniel Hobart and Kennedy knew that the water was boiling. Yes. And here Daniel – I think there's a fair inference based on the record here because of the longstanding – and it is important on Daniel Hobart that it is longstanding. But I think there's consistent evidence that says – inferences from the evidence that say it's longstanding. It's especially important in this case to draw the inferences in Mr. Ball's favor because there are affidavits from inmates that testify to the boiling water, that testify to the longstanding nature of it. Can we consider those? You can't consider them. Those aren't in the record. But he wasn't able to put them in the record, Your Honor, because he wasn't represented below. What is his best admissible, okay, admissible evidence that Hobart and Kennedy were aware of the longstanding problems with the floor, the hot water? And really you've got to focus on the longstanding part of their knowledge. Your Honor, I'm out of time. As long as we're asking questions, you can keep giving answers. I can very quickly give you the two pieces of evidence, the undisputably admissible evidence there. So one is Hobart's declaration where he says that he'd been there for a long – I knew. Pardon me. Not only that he knew, but that the practice had been going on for so long that he didn't recall when it had started. And the second piece is that Ball, even when he was just working in a dining room, was able to see the dangerous nature of the kitchen. And the other thing that I would say is Hobart's declaration. And I was looking at this today. Hobart declares in his declaration, excuse me, that at B-53 that he never actually witnessed inmates filling buckets from the kettles and carrying them to the sink. Yet he also testified in that same declaration that he knew that they were doing it, that he knew the situation of the floor, and he knew that they were required to heat the water. So it was so obvious that he testified under oath to personal knowledge of the fact that it occurred even though he had never witnessed it. That just shows exactly how obvious it is in this case. I think particularly to Hobart, and I'll reserve the rest of my time. Thank you. Thank you. Your time has expired, but I will give you one minute for rebuttal. Thank you. Ms. Gupta. May it please the court. Assistant Attorney General Priyanka Gupta for the defendant at police. Judge Easterbrook, I'd like to start by answering your question about the district court's notice. On April 9th, 2021, the district court entered a minute entry giving the required notice about providing affidavits in response to summary judgment. In addition to that, defense counsel three times during Ball's deposition, that's B-67, B-70, B-73, reminded him that he needs to turn over to her any affidavits or names of any witnesses he plans on using at trial. So he was put on notice, and we don't know why he ended up not submitting the affidavits. Now, Daniel Hobart admitted knowing the condition of the floor. Yes, you're right. Which Bally testified, you know, broken, uneven holes. And he also knew, of course, about the inmates carrying the water across this floor. It would seem from the record that the condition of the floor and the hot water problems were longstanding issues. And he oversaw the operation. As with, well, why would that not be enough? Yes, Your Honor, I'd first like to clarify that although Daniel Hobart knew about the floor being broken, he specifically declared he did not know there was a four to five inch deep hole, which seems to be the main problem here. That's what Ball tripped over. I'd also like to add, opposing counsel, when he was asked to identify two pieces of any evidence, his main point was that Daniel Hobart said this has been going on for a long time. But there was no evidence that in this long time there were ever any other complaints about this being dangerous, anyone ever fell or had a near accident. And so I think the longstanding nature of this practice actually shows that there wasn't anything particularly obviously risky about it occurring. I'd also like to address the court's questions about the hot water. I unfortunately didn't hear any specific references from opposing counsel about where- I'm sorry, you didn't hear what? Any specific references to the record about how the defendants knew the water was boiling. And what I did hear was a reference to Ball's affidavit. And in that he said he was instructed to dip, and I quote, So what we do have in the record is Daniel Hobart saying, And we also have Ball saying what he was instructed to do was to carry hot water. So we don't dispute that in this day and question the water must have been hot enough to cause a third degree burn. The question really here goes to the defendant's subjective knowledge. And we simply don't have any evidence here that either defendant had knowledge that there was a substantial risk of harm and then ignored that substantial risk of harm. What about the allegations against Susie Hobart that were dismissed at the 12B6 stage? It certainly seems, given her role in the allegations in the complaint, that there was sufficient evidence at that stage, drawing all reasonable inferences in Mr. Ball's favor, to conclude that she knew about the temperature of the water. Yes, Your Honor. So the allegations did say that she instructed him to carry the hot water. There's nothing more specific about whether it was boiling at that time or what the temperature was. There are just a few sentences about her and the complaint. What Ball does allege is that she said that his assignment was a mistake to be corrected and that she had personally submitted 10 work orders to get the hot water heater fixed. And as this court has recognized in cases like Ball, when a plaintiff pleads allegations that shows that a defendant was not deliberately indifferent or that they can't satisfy the elements of the claim, then that claim is properly dismissed. But she had control over how the inmates got the dishes washed. At the motion-to-dismiss stage, could we not infer that she could have directed that the dishwashing be moved to that other kitchen, that she could have directed the inmates to never heat the water past 110 degrees, that she could have provided smaller, safer buckets with secure handles and lids, that she could have somehow come up with a safer plan than carrying boiling water across a slippery, broken floor in plastic buckets? At the pleading stage, at the pleading stage, why isn't that enough? Your Honor, I think it's not enough because we would have to speculate at this point what she could or could not have done. Isn't that exactly what one does at the complaint stage? All you have to do is plead a grievance. You don't have to plead facts. The evidence comes later. Yes, Your Honor, I agree. But what he did plead was that she had said that she would change his assignment, and she had tried to get the water heater fixed. So she had taken— But reasonable measures are an affirmative defense. And I agree you can plead yourself on a court. But why were fixing the sink, potentially moving him, and putting in a work order the only available reasonable measures? Why weren't—at this stage, why do we have to assume that? Isn't that drawing the inference against the plaintiff here? No, Your Honor, I'd first like to address the premise of your question and then the more specific question. So as to the premise, we disagree that reasonable measures are an affirmative defense. Ball relies extensively on Jones v. Bach, which involved exhaustion. As this Court is well aware, an affirmative defense like exhaustion means that you can't be held liable even if there was wrongdoing. Reasonable measures goes to whether there was deliberate interference. So, for example, in Farmer— We're talking about—look, we're talking about a complaint. Yes, Your Honor, but I simply wanted to make the point that reasonable measures is not an affirmative defense. It might be something raised in defense, but it is not an affirmative defense. So the discussion of Jones v. Bach is an opposite. But as to the specific reasonable measures itself, we don't—we do agree that, of course, we have to construe these allegations in Ball's favor. But looking specifically at what he pled, he pled that she said that she would transfer him and that she had tried to get the water heater fixed. He didn't plead that she then told him to boil the water past 110 degrees or anything like that. So with the allegations that we do have here, he himself pled that she took reasonable measures, and that's why I was bringing it up. I would like to turn to the other two defendants that were also dismissed at screening, the warden and harbinger. There's nothing specific about those defendants besides their general job description. Counsel does argue that this was a systemic problem, and so their involvement could be inferred and relies on Smith v. Dart. That involves the type of situation where, for example, there is a rodent infestation throughout the whole prison. That's the type of condition this court has referred to systemic, where they think the warden should know about it. This was a specific thing happening in one area of the facility. It's not the systemic condition from which a warden's involvement can be inferred, because otherwise warden's involvements will always be inferred any time any type of specific incident is brought up. And then I finally wanted to emphasize what this court brought up in its questioning, is that Mr. Ball never sought leave to amend as to any of these three defendants. And in our net against Webster, this court made clear, yes, it is preferable for the district court to dismiss such claims without prejudice, but it's not the district court's responsibility to advise the plaintiff, even when they're pro se, to amend their complaint. District courts are not lawyers for the plaintiffs. They don't need to solicit more litigation. Can I just stop you for a moment? Look, Hobart, I mean, how would you ever get more in a case like this than Hobart saying, yeah, you know, I was aware of the problem. I mean, cases I normally see, what? There's gambling and, you know. Are we to believe that Hobart told the inmates? Or are we to believe that the inmates thought that they were only to heat the water to 110, using available thermometers to test it before carrying it across this dreadful floor to wash dishes? I mean, it just doesn't seem to me to be mere speculation that Hobart would know that they were carrying dangerously hot water if they're heating it in kettles, which are, you know, designed to boil water. And I don't think it's speculation that Hobart would know the condition of the floor he walked on. I mean, he's got to know it. I'm sorry, are you referring to Daniel Hobart? I think, in a way, we're supposed to just abandon our common sense. I would like to respond to your question, Your Honor, but I wanted to clarify, are you referring to Daniel Hobart or Susan Hobart? Oh, no, Daniel. Okay, thank you. I'm sorry. No, no, it's, you know, two Hobarts, two Kennedys in this case. I know. Small town. Talk about nepotism. I do want to address, of course, your question, Your Honor. So, I think this would be a different case if Daniel Hobart knew the water was boiling. I think, if anything, he was at most negligent for not, you know, going on and checking in the inmates. But, again, there was no evidence that anyone else had ever complained or there had been any issues with this practice. But his understanding was that the water was at 110 degrees, and that's not enough to burn someone. And, of course, it can be risky to carry 110-degree water across the floor. And this accident was unfortunate, but not every accident arises to a level of an Eighth Amendment violation. There are negligence claims for that. And here, we simply did not have enough evidence to show deliberate indifference. And I think that's what the problem is. But isn't that partly because of how everyone basically was pretty, not everyone, but, you know, screamed out before? No, Your Honor. Any opportunity to? No, Your Honor. The district court did allow the claims to proceed against two defendants and that it was Ball's burden to provide sufficient evidence. And the main thing he points to on appeal is the inmate affidavits. He describes those at D66-67. And those simply said the practice was going on for a long time. I don't really see how that helps him too much, again, because there was no evidence that there was any problem with that practice. And so even now, he hasn't really been able to point to anything more he might have been able to offer. I also wanted to note, Your Honor mentioned the other kitchen. That kitchen was in the max part of the facility. This is the medium part. And as this court is aware, there are obvious security concerns with sending inmates between the max and medium part. So there's nothing in the record about that being a viable alternative to wash the dishes here. I think what we're stuck with here is a very unique situation where, unfortunately, a culmination of conditions led to this accident. The water heater, when it would break, this was an as-needed basis. The water logs show that when the water heater would break, for example, November 27th, it's typically fixed the same day or within a few days. So this isn't something the prison did every day. It was prison officials trying to come up with a solution to get the job done. There weren't any evidence of any other issues. And, of course, it's very regrettable this happened to Mr. Ball, but this simply doesn't arise to a constitutional violation. If I may, I would like to address the recruitment of counsel briefly. You know, you argued that he didn't produce inmate affidavits and other necessary evidence in an admissible form and that he didn't need a lawyer. That's your argument. But why don't his repeated sort of amateurish efforts demonstrate that he was really, obviously, not able to represent himself adequately? Well, Your Honor, I first respectfully disagree that his efforts were that amateur. For example, on the B28, the third motion, he does recognize that this case would involve qualified immunities, totality of conditions, state of mind. He cites case law even from this circuit. And so he was able, even without the assistance of a jailhouse lawyer, to put together a motion. And I think, unfortunately, there is a high volume of such cases where a litigant would benefit from counsel and very few lawyers willing to represent them. And there isn't anything unique about this situation that would justify finding an abuse of discretion. The district court did apply the correct legal standard. I wanted to make one specific point, which was that Mr. Ball also participated in discovery, and defendants tried to strike his discovery. He opposed that motion, and he prevailed. The district court kept his discovery in. So he was able to navigate the legal process. And simply the fact that a lawyer could do a better job, this court has recognized is not enough to find an abuse of discretion. If there are no further questions, we ask that this court affirm further reasons in our brief. Thank you. Thank you. Thank you, counsel. Anything further, Mr. Tucker? If you'll give me a minute, I'll take it. Yes, I said I would give you a minute. So I'd just like to respond to specific issues that were raised by opposing counsel. Reasonable measures require an attempt to abate it, and he did not plead himself out of court by saying that she asked for help or reported the problem. Reporting the problem does nothing to actually abate the risk in front of him. Opposing counsel conceded up here that they tried to get it fixed every day. They could have just waited to wash dishes, and there's no reason that they had to endanger the life and limb of inmates in order to wash dishes on a day when they could fix it quickly. The logic of Farmer is that the obviousness of the risk creates an inference of knowledge, and so I think that goes a long way to understanding why Danny Hobart has knowledge in this case. Opposing counsel says that there's no evidence that the use of the maximum security kitchen could have been viable, but that's not true at B75. Ball testifies that they shifted the cooking of food over to the maximum security side, and then he actually worked in the maximum security kitchen prior to working here. So the record does support those reasonable measures. Thank you, Mr. Tucker. Thank you, Your Honor. The court appreciates your willingness and that of your law firm to accept the appointment in this case and your assistance to the court as well as your client. Thank you, Your Honor. The case is taken under advisement.